**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on April 15, 2021, which may be different from its entry on the record.**

**IT IS SO ORDERED.**

**Dated: April 15, 2021**



ARTHUR I. HARRIS
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

| In re: | ) | Chapter 13 |
| | ) | |
| HOWARD D. JUNTOFF, | ) | Case No. 19-17032 |
| Debtor. | ) | |
| | ) | Judge Arthur I. Harris |
| | ) | |

| In re: | ) | Chapter 13 |
| | ) | |
| GEORGE J. McPHERSON & | ) | Case No. 20-13035 |
| MELANIE A. McPHERSON, | ) | |
| Debtors. | ) | Judge Arthur I. Harris |

MEMORANDUM OF OPINION[1]

In these two Chapter 13 cases, the debtors have objected to the claims filed

by the United States on behalf of the Internal Revenue Service ("IRS"). At issue is

whether the shared responsibility payment for not having health insurance under

---

[1] This Opinion is not intended for official publication.

the Affordable Care Act is entitled to priority as "a tax on or measured by income or gross receipts" or "an excise tax on . . . a transaction" under § 507(a)(8)(A) or (E) of the Bankruptcy Code. For the reasons that follow, the Court finds that the shared responsibility payment is neither "a tax on or measured by income or gross receipts" nor "an excise tax on . . . a transaction" within the meaning of § 507(a)(8)(A) or (E) of the Bankruptcy Code and sustains the debtors' objections to the United States' claims.

## JURISDICTION

These are core proceedings under 28 U.S.C. § 157(b)(2)(I). The Court has jurisdiction over core proceedings under 28 U.S.C. §§ 1334 and 157(a) and Local General Order 2012-7 of the United States District Court for the Northern District of Ohio.

## BACKGROUND

The sole issue in each of these two Chapter 13 cases is whether the debtors' shared responsibility payment under the Affordable Care Act, included in the United States' proof of claim, is entitled to priority as "a tax on or measured by income or gross receipts" or "an excise tax on . . . a transaction" under § 507(a)(8)(A) or (E) of the Bankruptcy Code. Because the parties have stipulated that this issue is properly presented and can be resolved on the record without an

2

evidentiary hearing, the Court will limit its presentation of the factual and procedural background to those matters needed to understand the context of the issue at hand.

*Howard Juntoff*

On November 15, 2019, debtor Howard Juntoff filed for relief under Chapter 13 of the Bankruptcy Code. Case No. 19-17032; Docket No. 1. Although the United States has amended its proof of claim three times, the amount attributable to Juntoff's liability for the shared responsibility payment for calendar year 2018—the only portion of the proof of claim at issue—has remained unchanged. The United States claims a tax in the amount of $1,016 and prepetition interest of $26.39, for a total priority claim attributable to the shared responsibility payment for calendar year 2018 of $1,042.39. The United States identified this obligation as an "excise tax" on the original and first two amended proofs of claim, and as an "excise/income tax" on the third amended proof of claim. Although Juntoff filed his claim objection before the United States filed its third amended proof of claim, by agreement, the Court will treat Juntoff's claim objection as challenging the United States' third amended proof of claim.

Juntoff's Chapter 13 plan, which was confirmed on March 22, 2021, provides for payment in full of all priority tax claims and no payment for general

3

unsecured claims. Juntoff does not challenge the remainder of the United States' third amended proof of claim, which includes an additional $3,950.03 in priority tax claims. Thus, Juntoff's priority tax liability to the United States is either $4,992.42, if the $1,042.39 attributable to the shared responsibility payment for calendar year 2018 is allowed as a priority tax under § 507(a)(8), or $3,950.03, if the $1,042.39 is disallowed as a priority tax under § 507(a)(8).

*George and Melanie McPherson*

On June 24, 2020, debtors George and Melanie McPherson filed for relief under Chapter 13 of the Bankruptcy Code. Case No. 20-13035; Docket No. 1. Although the United States has amended its proof of claim three times, the amount attributable to the McPhersons' liability for the shared responsibility payment for calendar year 2017—the only portion of the proof of claim at issue—has remained unchanged. The United States claims a tax in the amount of $1,564 and prepetition interest of $136.70, for a total priority claim attributable to the shared responsibility payment for calendar year 2017 of $1,700.70. The United States identified this obligation as an "excise tax" on the original and first amended proofs of claim, and as an "excise/income tax" on the second and third amended proofs of claim. Although the McPhersons filed their claim objection before the United States filed its second and third amended proofs of claim, by agreement, the

4

Court will treat the McPhersons' claim objection as challenging the United States' third amended proof of claim.

The McPhersons' Chapter 13 plan, which was confirmed on November 16, 2020, provides for payment in full of all priority tax claims and payment of $29,168 or 22 percent, whichever is greater, for general unsecured claims. The McPhersons do not challenge the remainder of the United States' third amended proof of claim, which includes an additional $3,950.03 in priority tax claims. Thus, the McPhersons' priority tax liability to the United States is either $5,674.93, if the $1,700.70 attributable to the shared responsibility payment for calendar year 2017 is allowed as a priority tax under § 507(a)(8), or $3,974.23, if the $1,700.70 is disallowed as a priority tax under § 507(a)(8). If the McPhersons' shared responsibility payment for calendar year 2017 is disallowed as a priority tax under § 507(a)(8), the United States would also receive a pro rata distribution as the holder of a general unsecured claim in the amount of $1,700.70.

*Briefing and Argument on Claim Objections*

In addition to the initial claim objection and response in each of the two cases, *see* Case No. 19-17032, Docket Nos. 34, 37, 38; Case No. 20-13035, Docket Nos. 37, 49, the Court permitted a number of supplemental briefs. *See* Case No. 19-17032, Docket Nos. 48, 70, 75; Case No. 20-13035, Docket No. 56. The

5

Court heard oral argument on Juntoff's objection to the United States' claim on August 13, 2020, September 24, 2020, January 7, 2021, and February 18, 2021. The Court heard oral argument on the McPhersons' objection to the United States' claim in conjunction with oral argument on Juntoff's objection on January 7, 2021, and February 18, 2021. Juntoff and the McPhersons are represented by the same attorney.

During the argument on February 18, 2021, the parties agreed that the sole issue in each of these two Chapter 13 cases is whether the debtors' shared responsibility payment under the Affordable Care Act, included in the United States' proof of claim, is a priority tax under § 507(a)(8) of the Bankruptcy Code. The parties further agreed that this issue is properly presented and can be resolved on the record without an evidentiary hearing.

## RELEVANT STATUTES

### *Relevant Bankruptcy Statutes*

The United States asserts that in each of these two Chapter 13 cases, the debtors' shared responsibility payment under the Affordable Care Act, included in the United States' proof of claim, is a priority tax under § 507(a)(8)(A) or (E) of the Bankruptcy Code.

Section 507 provides in pertinent part:

6

(a) The following expenses and claims have priority in the following order:

. . . .

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—

(A) a tax on or measured by income or gross receipts for a taxable year ending on or before the date of the filing of the petition . . . .

. . . .

(E) an excise tax on—

(i) a transaction occurring before the date of the filing of the petition . . . .

11 U.S.C. § 507(a)(8)(A), (E).

In addition, § 523(a) of the Bankruptcy Code makes debts that fall within the priority provisions of § 507(a)(8) nondischargeable.

Section 523(a) provides in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

(A) of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed[.]

11 U.S.C. §523(a)(1)(A).

For Chapter 13 debtors such as Juntoff and the McPhersons, their Chapter 13 plan must provide for full payment of all claims entitled to priority under § 507.

Section 1322(a) provides in pertinent part:

7

> (a) The plan—
>
>> . . . .
>>
>> (2) shall provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title, unless the holder of a particular claim agrees to a different treatment of such claim[.]

11 U.S.C. §1322(a)(2).

Thus, whether the shared responsibility payments under the Affordable Care Act are entitled to priority under § 507(a)(8) of the Bankruptcy Code determines not only whether the resulting claim receives priority treatment over general unsecured creditors (for example, in the *Juntoff* case, the difference is payment in full as a priority claim versus no payment whatsoever as a general unsecured claim), it also dictates how much debtors must pay for a plan to be confirmed and for the debtor to receive a general discharge of all other debts under § 1328(a). In other words, a Chapter 13 debtor must pay in full all allowed priority claims under § 507(a)(8) in order to discharge any other debts.

### *26 U.S.C. § 5000A*

The statutory authority for the shared responsibility payment at issue in these two Chapter 13 cases is contained in 26 U.S.C. § 5000A. Congress created § 5000A as part of the Affordable Care Act. *See* Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119.

Under § 5000A(a), as amended, Congress required applicable individuals to maintain a minimum level of health insurance coverage for such individuals and their dependents for every month beginning in 2014. Under § 5000A(b), individuals who fail to maintain a minimum level of coverage for themselves and their dependents must pay a penalty in an amount determined under § 5000A(c), unless they are subject to one of the exceptions under § 5000A(d). Exceptions under § 5000A(d) include members of certain religious sects and individuals who are incarcerated. Subsection 5000A(e) contains a list of additional exemptions under which no penalty is imposed. These exemptions include "individuals who cannot afford coverage," "taxpayers with income under 100 percent of poverty line," "taxpayers with income below filing threshold," and "members of Indian tribes." Subsection 5000A(f) defines the "minimum essential coverage" required. Subsection 5000A(g) explains how the penalty is to be paid, collected, and assessed, and contains limitations on enforcement. For example, subsection 5000A(g) prohibits the criminal prosecution of taxpayers for failure to pay the penalty imposed by this section. It also prohibits the filing of a notice of lien or levy against property for failure to pay the penalty imposed by this section. (The entire text of § 5000A, as it existed just before Congress passed the Tax Cuts and Jobs Act in December 2017, is reproduced in the Appendix of this opinion.)

9

In December 2017, as part of the Tax Cuts and Jobs Act, Congress reduced to zero the amount of the shared responsibility payment imposed by § 5000A(c), effective January 1, 2019. *See* Pub. L. No. 115-97, § 11081, 131 Stat. 2054, 2092 (2017). The individual mandate to maintain minimum health insurance under § 5000A(a) continues, although the payment for noncompliance is now zero. Section 11081 of the Tax Cuts and Jobs Act provides as follows:

SEC. 11081. ELIMINATION OF SHARED RESPONSIBILITY PAYMENT FOR INDIVIDUALS FAILING TO MAINTAIN MINIMUM ESSENTIAL COVERAGE.

(a) In General.—Section 5000A(c) is amended—

(1) in paragraph (2)(B)(iii), by striking ''2.5 percent'' and inserting ''Zero percent'', and
(2) in paragraph (3)—
(A) by striking ''$695'' in subparagraph (A) and inserting ''$0'', and
(B) by striking subparagraph (D).

(b) Effective Date.— The amendments made by this section shall apply to months beginning after December 31, 2018.

Pub. L. No. 115-97, § 11081, 131 Stat. 2054, 2092.

On November 10, 2020, the Supreme Court heard oral argument in two consolidated cases involving this amendment to § 5000A(c). *California v. Texas*, Case No. 19-840, and *Texas v. California*, Case No. 19-1019. Besides standing,

10

the questions presented are whether reducing the amount specified in § 5000A(c) to zero rendered the individual coverage provision unconstitutional and, if so, whether this provision is severable from the rest of the Affordable Care Act.

*Relevant Calculations under §5000A(c)*

Before Congress reduced the shared responsibility payment to zero for tax years after 2018, § 5000A(c) detailed the procedure for calculating the "amount of penalty" owed by individuals who fail to maintain the minimum essential coverage required under § 5000A(a).

Under § 5000A(c)(1), the "amount of the penalty imposed by this section . . . shall be equal to the lesser of—the sum of the monthly penalty amounts determined under [§ 5000A(c)(2)]" or "an amount equal to the national average premium for qualified health plans which have a bronze level of coverage."

Section 5000A(c)(2) set forth the "Monthly penalty amounts" as "equal to 1⁄12 of the greater of" a "Flat dollar amount" set forth in § 5000A(c)(2)(A) or a "Percentage of income" set forth in § 5000A(c)(2)(B).

Under § 5000A(c)(3), for calendar years 2017 and 2018 Congress generally set the "Flat dollar amount" at $695 per adult and one-half that amount, or $347.50, for children under 18.

11

Under § 5000A(c)(2)(B), for calendar years 2017 and 2018 Congress set the "Percentage of income" amount as equal to 2.5 percent "of the excess of the taxpayer's household income for the taxable year over the amount of gross income specified in § 6012(a)(1)." In other words, the "Percentage of income" amount is 2.5 percent of the amount of household income above the threshold amount for which a federal tax return is required under § 6012(a)(1).

*Calculation for Juntoff*

Juntoff had no minimum health insurance for all twelve months of 2018 and had no dependents. *See* Case No. 19-17032; Docket No. 70. For a single filer without health insurance for the entire year, the "Flat dollar amount" was $695. § 5000A(c)(3)(A). On his income tax return for 2018, Juntoff reported taxable income of $40,629. *See* Docket No. 75; Exhibit A. Taxable income multiplied by 2.5 percent results in a "Percentage of income" amount of $1,015.72 (rounded to $1,016). Because the "Percentage of income" amount of $1,016 is greater than the "Flat dollar amount" of $695, the "Percentage of income" amount of $1016 is used under § 5000A(c)(2). Then, this number is compared to the national average premium for qualified health plans for one person, which have a bronze level of coverage, which was $3,396. The lesser number—$1,016—is then selected under

12

§ 5000A(c)(1). Therefore, Juntoff's shared responsibility payment under § 5000A(c)(1) for not having health insurance for all of 2018 was $1,016.

*Calculation for the McPhersons*

The McPhersons had no minimum health insurance for nine months of 2017 and had two dependents. *See* Case No 20-13035; Docket No. 56. During 2017, the "Flat dollar amount" was $695 for members of the household over 18 and $347.50 for members under 18 that went without minimum health insurance during the year. § 5000A(c)(3)(A), (C). Therefore, the total "Flat dollar amount," when prorated for the nine months the McPhersons were without minimum health insurance, was $1,563.75 (rounded to $1,564). On their income tax return for 2017, the McPhersons reported taxable income of $53,273. *See* Docket No. 56; Exhibit A. Taxable income multiplied by 2.5 percent results in $1,331.83. Because the McPhersons were without minimum health insurance for nine months, the "Percentage of income" amount is prorated and equals $998.87 (rounded to $999). Because the "Flat dollar amount" of $1,564 is greater than the "Percentage of income" amount of $999, the "Flat dollar amount" of $1,564 is used under § 5000A(c)(2). Then, this number is compared to the national average premium for qualified health plans for four people, which have a bronze level of coverage, which was $13,056. The lesser number—$1,564—is then selected under

13

§ 5000A(c)(1).  Therefore, the McPhersons' shared responsibility payment under § 5000A(c)(1) for not having health insurance for nine months of 2017 was $1,564.

## DISCUSSION

The sole issue in each of these two Chapter 13 cases is whether the debtors' shared responsibility payment under the Affordable Care Act, included in the United States' proof of claim, is entitled to priority as "a tax on or measured by income or gross receipts" or "an excise tax on . . . a transaction" under § 507(a)(8)(A) or (E) of the Bankruptcy Code.

### *Burden of Proof*

The United States, as the claimant, has the burden of proving that its claim is entitled to priority treatment.  *See In re Micek*, 473 B.R. 185, 188 (Bankr. E.D. Ky. 2012) (claimant had the burden of proof to show that a domestic support obligation was entitled to priority status); *see also In re Clark*, 441 B.R. 752, 755 (Bankr. M.D.N.C. 2011).  The Supreme Court has established the preponderance of evidence as the standard of proof for dischargeability actions under § 523 of the Bankruptcy Code and for civil actions in general.  *See Grogan v. Garner*, 498 U.S. 279, 287 (1991).  And given that priority status under § 507(a)(8) dictates whether a debt is nondischargeable under § 523(a), the Court will apply the same

14

preponderance of the evidence standard in determining whether the United States'

claims at issue here are entitled to priority status under § 507(a)(8).

*The Court Will Assume that the Shared Responsibility Payment is a Tax for*
*Purposes of Determining Whether the Exaction is Entitled to Priority Treatment*
*under § 507(a)(8)(A) or (E) of the Bankruptcy Code*

In *United States v. Reorganized CF&I Fabricators of Utah, Inc*., 518 U.S.

213 (1996), the Supreme Court expressly held that when determining whether an

exaction is a tax for purposes of § 507(a)(7) of the Bankruptcy Code (now codified

at § 507(a)(8)), a court must look behind the label placed on the exaction and

instead make a "functional examination" of the statutory scheme. 518 U.S. at 220;

*accord In re Rizzo*, 741 F.3d 703, 706 (6th Cir. 2014). In determining whether an

exaction is entitled to priority status as a tax under the Bankruptcy Code, a court

must engage:

> . . . in a "functional examination" of the applicable statutory scheme to
> determine whether it falls within the federal statutory definition. . . . In doing
> so, the statutory labels of the exaction are not dispositive; the court must
> instead evaluate the statute's "actual effects to determine whether it
> functions as either a tax or else as some different kind of obligation."

741 F.3d at 705 (citations omitted).

In *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012), the Supreme

Court engaged in an analogous functional examination of the same statute at issue

here to decide whether the statute could be upheld as constitutional under

15

Congress's taxing power. 567 U.S. at 565. Indeed, the United States argues that this Court must construe § 5000A as a tax for purposes of the Bankruptcy Code because courts must construe a statute consistently with the way that it has been construed constitutionally. *See* United States' Reply Brief in Opposition at 6 (citing *Clark v. Martinez*, 543 U.S. 371, 381 (2005)).

Whether the shared responsibility payment functions as a tax or some different kind of obligation for purposes of the Bankruptcy Code is a complicated question. The functional test that the Supreme Court employed in *NFIB v. Sebelius*, while analogous to the one used to determine priority status under the Bankruptcy Code, is not identical. Nor is it clear whether the constitutional analysis in *NFIB v. Sebelius* mandates a similar result when analyzing § 5000A in relation to the Bankruptcy Code.

The Chief Justice's majority decision in *NFIB v. Sebelius* emphasized that in deciding whether the shared responsibility payment can be characterized as a tax for constitutional purposes, every effort should be made to save the statute from unconstitutionality.

> The question is not whether that is the most natural interpretation of the mandate, but only whether it is a "fairly possible" one. *Crowell v. Benson*, 285 U.S. 22, 62 (1932). As we have explained, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657 (1895).

16

567 U.S. at 563. This preference for whatever interpretation can support a statute's constitutionality stands in marked contrast to the test the Supreme Court enunciated in *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651 (2006) for determining whether a claim is entitled to priority treatment under § 507 of the Bankruptcy Code—"that provisions allowing preferences must be tightly construed" and that "[a]ny doubt concerning the appropriate characterization . . . is best resolved in accord with the Bankruptcy Code's equal distribution aim." 547 U.S. at 667–68; *see also In re Daley*, 315 F.Supp.3d 679, 682–83 (D. Mass. 2018) (declining to treat the functional analysis in *NFIB v. Sebelius* as binding precedent for purposes of the functional examination of a different statute under § 507(a)(8) of the Bankruptcy Code).

In addition, the Supreme Court itself construed the shared responsibility payment differently in the same opinion. For purposes of constitutionality, it was a tax; but for purposes of the Anti-Injunction Act it was a penalty. As the Chief Justice explained:

> Congress's decision to label this exaction a "penalty" rather than a "tax" is significant because the Affordable Care Act describes many other exactions it creates as "taxes." . . . . Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally. . . .
>
> . . . It is true that Congress cannot change whether an exaction is a tax or a penalty for *constitutional* purposes simply by describing it as one or the

17

other. Congress may not, for example, expand its power under the Taxing Clause, or escape the Double Jeopardy Clause's constraint on criminal sanctions, by labeling a severe financial punishment a "tax." . . .

The Anti-Injunction Act and the Affordable Care Act, however, are creatures of Congress's own creation. How they relate to each other is up to Congress, and the best evidence of Congress's intent is the statutory text.

*NFIB v. Sebelius*, 567 U.S. at 544–45 (citations omitted).

Although the functional test for purposes of priority under § 507(a)(8) may be different from the test employed in *NFIB v. Sebelius*, this Court is reluctant to wade into this complicated area if the issue before the Court can be decided on other grounds. For example, if the shared responsibility payment is not entitled to priority as "a tax on or measured by income or gross receipts" or "an excise tax on . . . a transaction" under § 507(a)(8)(A) or (E) of the Bankruptcy Code, *even assuming it functions as a tax*, then the Court need not decide whether the functional analysis in *NFIB v. Sebelius* is binding for purposes of determining the shared responsibility payment's priority status under the Bankruptcy Code.

As explained more fully below, the Court holds that the shared responsibility payment is neither "a tax on or measured by income or gross receipts" nor "an excise tax on . . . a transaction" within the meaning of § 507(a)(8)(A) or (E) of the Bankruptcy Code, even assuming it functions as a tax. Therefore, the Court need not decide whether the functional analysis in *NFIB v. Sebelius* is binding for

18

purposes of determining the shared responsibility payment's priority status under the Bankruptcy Code. Nor must this Court decide what answer the correct functional analysis would indicate.

## Priority Analysis

The United States has the burden of showing that the shared responsibility payment is entitled to priority treatment as "a tax on or measured by income or gross receipts" or "an excise tax on . . . a transaction" under § 507(a)(8)(A) or (E) of the Bankruptcy Code. Because the United States first claimed that the shared responsibility payment was an "excise tax," the Court will address § 507(a)(8)(E) before analyzing whether it is "a tax on or measured by income or gross receipts" under § 507(a)(8)(A).

## § 507(a)(8)(E) ("an excise tax on . . . a transaction")

Congress placed § 5000A, which contains the requirement to maintain minimal essential health coverage, under Subtitle D of the Internal Revenue Code, which is entitled "Miscellaneous Excise Taxes." Section 507(a)(8)(E) extends priority status to certain excise taxes on ". . . a transaction before the date of the filing of the petition[.]" The United States asserts that the shared responsibility payment under § 5000A is an excise tax "on a transaction" because a taxpayer has an obligation, upon reaching a certain threshold of income, to maintain minimum

19

health coverage, and the act of not purchasing required health coverage is the exercise of a right of privilege within the broad definition of "excise tax" as explained in *Rizzo*.

*Rizzo* says that "[t]ypically, an excise tax is imposed upon 'a discrete act by the person or entity being taxed,' in contrast with, for example, a tax on income." *Rizzo*, 741 F.3d at 706 (internal citations omitted).  As *Rizzo* goes on to explain: "Still, an 'excise' has a 'broad definition,' essentially encompassing any tax that is 'indirectly assessed'; that is, any tax 'that is not directly imposed upon people or property' but is instead 'imposed upon a particular use of property' or upon the exercise of a 'right or privilege.'" *Id*.

While a tax on failing to obtain minimum insurance coverage would qualify as an excise tax under *Rizzo*, the Bankruptcy Code does not provide priority treatment on all excise taxes.  Rather, priority treatment under § 507(a)(8)(E) is limited to an excise tax "on . . . a transaction" occurring within a specific time period before the date of the filing of the bankruptcy petition. § 507(a)(8)(E)(i).

Black's Law Dictionary defines transaction as:

Act of transacting or conducting any business; negotiation; management; proceeding; that which is done; an affair.  It may involve selling, leasing, borrowing, mortgaging or lending.   Something which has taken place, whereby a cause of action has arisen.  It must therefore consist of an act or agreement, or several acts or agreements having some connection with each other, in which more than one person is concerned, and by which the legal

20

relations of such persons between themselves are altered.  It is a broader term than "contract."

*Transaction*, Black's Law Dict. (5th ed. 1979).

Webster's New Collegiate Dictionary (1975) defines transaction as: "an act, process, or instance of transacting," or "something transacted; *esp* : a business deal."  The same dictionary further defines "transact" as "to carry on business" or "to carry out" or "perform." Webster's New Collegiate Dict. (8th ed. 1975).

Under the ordinary meaning of "transaction," it is impossible to construe the language contained in § 507(a)(8)(E) as encompassing "excise taxes" on events in which a taxpayer failed to act.  There is no "discrete act" which can reasonably be determined to fall within the language of § 507(a)(8)(E).  In fact, the shared responsibility payment imposes an exaction on the opposite of a discrete act—a failure to act or an omission.  This conclusion is especially true given the principle that courts tightly construe priority determinations under the Bankruptcy Code. *See Howard Delivery*, 547 U.S. at 653.  The Court rejects the United States' argument that the act of earning enough income to become obligated to maintain minimum coverage somehow constitutes a "transaction."  Inaction is not a transaction.  And while an exaction for failure to purchase health insurance may constitute an excise tax, it is not an excise tax on a "transaction."

21

Nor does this plain reading of "transaction" lead to an absurd result. There is nothing inherently wrong with Congress limiting priority status to those excise taxes that involve transactions. Indeed, Congress has already declined to put the shared responsibility payment on equal footing with other excise taxes when it prohibited the government from using traditional tax collection and enforcement tools for nonpayment. *See* § 5000A(g)(2); *see also NFIB v. Sebelius*, 567 U.S. at 566.

Indeed, a large number of courts that have addressed this issue agree that the shared responsibility payment is not an excise tax on a "transaction" within the meaning of § 507(a)(8)(E). *See e.g., Matter of Chesteen*, 799 F.App'x 236, 240 (5th Cir. 2020); *In re Robert Szczyporski*, Civil No. 2:20-cv-03133, 2021 WL 1207413, at *4–5 (E.D. Pa. March 31, 2021); *Internal Revenue Service v. Huenerberg*, 623 B.R. 841, 845 (E.D. Wis. 2020); *In re Albracht*, 617 B.R. 851, 855 (Bankr. E.D.N.C. 2020); *In re Jones*, 610 B.R. 663, 670 (Bankr. D. Montana 2019) (finding that the shared responsibility payment was an excise tax but not an excise tax "on a transaction"); *In re Bailey*, 2019 WL 2367180, at *6 (Bankr. E.D.N.C. May 24, 2019), *vacated as moot*, *United States v. Bailey,* No. 5:19-cv-226, 2019 WL 7403930 (E.D.N.C. Nov. 22, 2019) (finding that the shared

22

responsibility payment is a penalty, not a tax, and even if it were a tax, it would not fit into any of the categories listed in § 507(a)(8)).

In other words, while the Supreme Court has said that an exaction on inactivity can be characterized as an excise tax for constitutional purposes, the Bankruptcy Code expressly limits priority status to those excise taxes on a transaction within a certain time period. Accordingly, the Court rejects the argument that the shared responsibility payment is entitled to priority treatment as an excise tax on a transaction under § 507(a)(8)(E) the Bankruptcy Code.

*§ 507(a)(8)(A) ("a tax on or measured by income or gross receipts")*

The United States argues in the alternative that the shared responsibility payment is entitled to priority as a "tax on or measured by income or gross receipts" under § 507(a)(8)(A), despite the fact that Congress placed § 5000A under Subtitle D of the Internal Revenue Code, which is entitled "Miscellaneous Excise Taxes." This alternative position seems to have come about in part because the United States' initial position, that it is "an excise tax on . . . a transaction" under § 507(a)(8)(E), has not fared well in the courts. *See*, *e.g.*, *Chesteen*, 799 F. App'x at 242 (declining to consider the United States' argument that the shared responsibility is a tax on income because it failed to raise the argument below). In the *Juntoff* and *McPherson* cases, the United States did not assert that

23

the shared responsibility payment was a tax "on or measured by income or gross receipts" within the meaning of § 507(a)(8)(A) until it filed amended claims in both cases on December 15, 2020.  *See* Case No. 19-17032; Proof of Claim No. 3-4 & Case No. 20-13035; Proof of Claim No. 8-3.

The Court does not take issue with the United States' ability to raise new arguments in support of its claims for priority treatment under the Bankruptcy Code or to change its litigating position in this case.  Indeed, the Court would welcome a decision by the United States to no longer assert that the shared responsibility payment is entitled to priority treatment under the Bankruptcy Code, especially given Congress's refusal to call the exaction a tax; Congress's refusal to put the shared responsibility payment on equal footing with other taxes, including income taxes, when it prohibited the government from using traditional tax collection and enforcement tools for nonpayment; and Congress's reducing the penalty to zero for all applicable individuals beginning in 2019, while leaving untouched the requirement to maintain minimum health insurance under § 5000A.

In the absence of such action by the United States, the Court will address the merits of the United States' argument that the shared responsibility payment is entitled to priority as a "tax on or measured by income or gross receipts" under § 507(a)(8)(A).

24

Section 507(a)(8)(A) extends priority status to certain taxes "on or measured by income or gross receipts." The United States does not credibly assert that the shared responsibility payment under § 5000A is a tax "on" income. After all, the payment is for failure to maintain minimum insurance coverage under § 5000A(a). *See* § 5000A(b)(1). Rather, the United States maintains that because an individual's household income is part of the complex formula for calculating the shared responsibility payment under § 5000A(c), the payment constitutes a tax "measured by income or gross receipts" under § 507(a)(8)(A).

Granted, one could read the statutory text in a vacuum as giving priority treatment to two distinctly different creatures: (1) a tax "on" income or gross receipts, and (2) "a tax [on anything so long as it is] measured [in any way, shape, or form] by income or gross receipts." Under this interpretation, a tax on not having health insurance could fit within the latter category so long as it was measured, at least in part, on a taxpayer's income.

There are several problems with this argument. For starters, the second category—"a tax [on anything so long as it is] measured [in any way, shape, or form] by income or gross receipts"—would by definition swallow up the first category—a tax "on" income or gross receipts. In other words, this interpretation would render superfluous the term "on."

25

Second, such a broad reading runs contrary to the guidance from the Supreme Court that provisions allowing preferences for certain claims in bankruptcy must be tightly construed. *See Howard Delivery*, 547 U.S. at 653. For example, a better and tighter construction of § 507(a)(8)(A) would be to treat "on" and "measured by" as two closely-related terms to encompass all traditional income taxes, but not so broad as to include "a tax [on anything so long as it is] measured [in any way, shape, or form] by income or gross receipts.

Nor does this reading of "on or measured by income or gross receipts" lead to an absurd result. There is nothing inherently wrong with Congress limiting priority status under § 507(a)(8)(A) to taxes that are traditionally understood as income taxes as opposed to expanding the definition to include taxes on things besides income, so long as they are measured in any way, shape, or form by income. As mentioned earlier, Congress has already declined to put the shared responsibility payment on equal footing with other taxes, including income taxes, when it prohibited the government from using traditional tax collection and enforcement tools for nonpayment. *See* § 5000A(g)(2); *see also NFIB v. Sebelius*, 567 U.S. at 566.

Calculation of the shared responsibility payment depends on a complicated formula for which income is at most one of many factors to be considered. Other

26

factors that make up the formula for calculating the shared responsibility payment under § 5000A(c) include:

- the number of adults in a household without health insurance,

- the number of months each adult was without health insurance,

- the number of children in a household without health insurance,

- the number of months each child was without health insurance,

- a flat tax set by Congress per uninsured adult,

- a flat tax set by Congress per uninsured child, and

- a ceiling based on the national average cost of certain health insurance plans that have a bronze level of coverage.

26 U.S.C. § 5000A(c).

Nor does income come into play for everyone subject to the shared responsibility payment. For instance, the calculation of the McPhersons' shared responsibility payment is instructive. Under § 5000A, the tax is the greater of the "Flat dollar amount" based on number of uninsured adults and children determined monthly or the "Percentage of income" amount which is 2.5 percent of the McPhersons' taxable income over the filing threshold specified in 26 U.S.C. § 6012(a)(1). § 5000A(c)(2). For the McPhersons, this turned out to be the greater of $1,564 ("Flat dollar amount") or $999 ("Percentage of income" amount). In other words, their actual shared responsibility payment for 2017 was

27

not measured by income at all. Or their income was only relevant because it confirmed their shared responsibility payment equaled the flat tax for not having health insurance.

The United States argues that income information is needed to calculate the shared responsibility payment for all applicable individuals, if only to determine whether they meet the minimum income threshold under § 5000A(e)(2) in order to be subject to any payment at all. But this minimum income threshold is an exemption in the statute just like the exemption for members of Indian tribes under § 5000A(e)(3). To the extent that the income plays a role in determining whether one is exempt from the shared responsibility payment, it would be no more correct to say that the shared responsibility payment is "measured by income" than it would be to say that the shared responsibility payment is "measured by membership in an Indian Tribe" or any other criteria justifying an exemption under the statute.

The undersigned judge respectfully disagrees with those courts, such as the court in *Szczyporski*, that have held the shared responsibility payment to be a priority as a tax "on or measured by income or gross receipts" under § 507(a)(8)(A). Courts like *Szczyporski* and *Matter of Cousins*, 601 B.R. 609, 620–21 (Bankr. E.D. La. 2019) do not appear to have applied the standard of tight

28

construction under *Howard Delivery*. Nor have these courts considered the fact that only a subset of applicable individuals have their shared responsibility payment determined by income.

In arguing that the shared responsibility payment is a tax "on or measured by income or gross receipts" within the meaning of § 507(a)(8)(A), the United States is essentially trying to fit a square peg into a round hole. The square peg only fits if the round hole is made so big that any peg will fit regardless of its shape. But the Supreme Court in *Howard Delivery* has directed "that provisions allowing preferences must be tightly construed," and "[a]ny doubt concerning the appropriate characterization . . . is best resolved in accord with the Bankruptcy Code's equal distribution aim." 547 U.S. at 653, 668.

Accordingly, the Court rejects the argument that the shared responsibility payment is a tax "on or measured by income or gross receipts" entitled to priority treatment under § 507(a)(8)(A) of the Bankruptcy Code.

## CONCLUSION

For the reasons stated above, the Court holds that the shared responsibility payment is not a tax entitled to priority treatment under § 507(a)(8) of the Bankruptcy Code and sustains the objections in both cases. Specifically, the "excise/income" tax for Howard Juntoff in the amount of $1,016.00 and $29.39 in

29

interest in Claim 3-4 is allowed only as a general unsecured claim, reducing the United States' priority tax claim from $4,992.42 to $3,950.03, and the "excise/income" tax for the McPhersons in the amount of $1,564.00 and $136.70 in interest in Claim 8-4 is allowed only as a general unsecured claim, reducing the United States' priority tax claim from $5,674.93 to $3,974.23

IT IS SO ORDERED.

EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by Pub. L. 101–239 applicable to items and services furnished after Dec. 19, 1989, see section 6202(b)(5) of Pub. L. 101–239, set out as a note under section 162 of this title.

EFFECTIVE DATE

Section applicable to items and services furnished on or after Jan. 1, 1987, see section 9319(f) of Pub. L. 99–509, set out as an Effective Date of 1986 Amendment note under section 1395y of Title 42, The Public Health and Welfare.

## CHAPTER 48—MAINTENANCE OF MINIMUM ESSENTIAL COVERAGE

Sec.
5000A. Requirement to maintain minimum essential coverage.

### §5000A. Requirement to maintain minimum essential coverage

**(a) Requirement to maintain minimum essential coverage**

An applicable individual shall for each month beginning after 2013 ensure that the individual, and any dependent of the individual who is an applicable individual, is covered under minimum essential coverage for such month.

**(b) Shared responsibility payment**

**(1) In general**

If a taxpayer who is an applicable individual, or an applicable individual for whom the taxpayer is liable under paragraph (3), fails to meet the requirement of subsection (a) for 1 or more months, then, except as provided in subsection (e), there is hereby imposed on the taxpayer a penalty with respect to such failures in the amount determined under subsection (c).

**(2) Inclusion with return**

Any penalty imposed by this section with respect to any month shall be included with a taxpayer's return under chapter 1 for the taxable year which includes such month.

**(3) Payment of penalty**

If an individual with respect to whom a penalty is imposed by this section for any month—

(A) is a dependent (as defined in section 152) of another taxpayer for the other taxpayer's taxable year including such month, such other taxpayer shall be liable for such penalty, or

(B) files a joint return for the taxable year including such month, such individual and the spouse of such individual shall be jointly liable for such penalty.

**(c) Amount of penalty**

**(1) In general**

The amount of the penalty imposed by this section on any taxpayer for any taxable year with respect to failures described in subsection (b)(1) shall be equal to the lesser of—

(A) the sum of the monthly penalty amounts determined under paragraph (2) for months in the taxable year during which 1 or more such failures occurred, or

(B) an amount equal to the national average premium for qualified health plans which have a bronze level of coverage, provide coverage for the applicable family size involved, and are offered through Exchanges for plan years beginning in the calendar year with or within which the taxable year ends.

**(2) Monthly penalty amounts**

For purposes of paragraph (1)(A), the monthly penalty amount with respect to any taxpayer for any month during which any failure described in subsection (b)(1) occurred is an amount equal to 1/12 of the greater of the following amounts:

**(A) Flat dollar amount**

An amount equal to the lesser of—

(i) the sum of the applicable dollar amounts for all individuals with respect to whom such failure occurred during such month, or

(ii) 300 percent of the applicable dollar amount (determined without regard to paragraph (3)(C)) for the calendar year with or within which the taxable year ends.

**(B) Percentage of income**

An amount equal to the following percentage of the excess of the taxpayer's household income for the taxable year over the amount of gross income specified in section 6012(a)(1) with respect to the taxpayer for the taxable year:

(i) 1.0 percent for taxable years beginning in 2014.

(ii) 2.0 percent for taxable years beginning in 2015.

(iii) 2.5 percent for taxable years beginning after 2015.

**(3) Applicable dollar amount**

For purposes of paragraph (1)—

**(A) In general**

Except as provided in subparagraphs (B) and (C), the applicable dollar amount is $695.

**(B) Phase in**

The applicable dollar amount is $95 for 2014 and $325 for 2015.

**(C) Special rule for individuals under age 18**

If an applicable individual has not attained the age of 18 as of the beginning of a month, the applicable dollar amount with respect to such individual for the month shall be equal to one-half of the applicable dollar amount for the calendar year in which the month occurs.

**(D) Indexing of amount**

In the case of any calendar year beginning after 2016, the applicable dollar amount shall be equal to $695, increased by an amount equal to—

(i) $695, multiplied by

(ii) the cost-of-living adjustment determined under section 1(f)(3) for the calendar year, determined by substituting ''calendar year 2015'' for ''calendar year 1992'' in subparagraph (B) thereof.

If the amount of any increase under clause (i) is not a multiple of $50, such increase

shall be rounded to the next lowest multiple of $50.

**(4) Terms relating to income and families**

For purposes of this section—

**(A) Family size**

The family size involved with respect to any taxpayer shall be equal to the number of individuals for whom the taxpayer is allowed a deduction under section 151 (relating to allowance of deduction for personal exemptions) for the taxable year.

**(B) Household income**

The term "household income" means, with respect to any taxpayer for any taxable year, an amount equal to the sum of—

(i) the modified adjusted gross income of the taxpayer, plus

(ii) the aggregate modified adjusted gross incomes of all other individuals who—

(I) were taken into account in determining the taxpayer's family size under paragraph (1), and

(II) were required to file a return of tax imposed by section 1 for the taxable year.

**(C) Modified adjusted gross income**

The term "modified adjusted gross income" means adjusted gross income increased by—

(i) any amount excluded from gross income under section 911, and

(ii) any amount of interest received or accrued by the taxpayer during the taxable year which is exempt from tax.

**(d) Applicable individual**

For purposes of this section—

**(1) In general**

The term "applicable individual" means, with respect to any month, an individual other than an individual described in paragraph (2), (3), or (4).

**(2) Religious exemptions**

**(A) Religious conscience exemption**

Such term shall not include any individual for any month if such individual has in effect an exemption under section 1311(d)(4)(H) of the Patient Protection and Affordable Care Act which certifies that such individual is—

(i) a member of a recognized religious sect or division thereof which is described in section 1402(g)(1), and

(ii) an adherent of established tenets or teachings of such sect or division as described in such section.

**(B) Health care sharing ministry**

**(i) In general**

Such term shall not include any individual for any month if such individual is a member of a health care sharing ministry for the month.

**(ii) Health care sharing ministry**

The term "health care sharing ministry" means an organization—

(I) which is described in section 501(c)(3) and is exempt from taxation under section 501(a),

(II) members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,

(III) members of which retain membership even after they develop a medical condition,

(IV) which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999, and

(V) which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

**(3) Individuals not lawfully present**

Such term shall not include an individual for any month if for the month the individual is not a citizen or national of the United States or an alien lawfully present in the United States.

**(4) Incarcerated individuals**

Such term shall not include an individual for any month if for the month the individual is incarcerated, other than incarceration pending the disposition of charges.

**(e) Exemptions**

No penalty shall be imposed under subsection (a) with respect to—

**(1) Individuals who cannot afford coverage**

**(A) In general**

Any applicable individual for any month if the applicable individual's required contribution (determined on an annual basis) for coverage for the month exceeds 8 percent of such individual's household income for the taxable year described in section 1412(b)(1)(B) of the Patient Protection and Affordable Care Act. For purposes of applying this subparagraph, the taxpayer's household income shall be increased by any exclusion from gross income for any portion of the required contribution made through a salary reduction arrangement.

**(B) Required contribution**

For purposes of this paragraph, the term "required contribution" means—

(i) in the case of an individual eligible to purchase minimum essential coverage consisting of coverage through an eligible-employer-sponsored plan, the portion of the annual premium which would be paid by the individual (without regard to whether paid through salary reduction or otherwise) for self-only coverage, or

(ii) in the case of an individual eligible only to purchase minimum essential coverage described in subsection (f)(1)(C), the

annual premium for the lowest cost bronze plan available in the individual market through the Exchange in the State in the rating area in which the individual resides (without regard to whether the individual purchased a qualified health plan through the Exchange), reduced by the amount of the credit allowable under section 36B for the taxable year (determined as if the individual was covered by a qualified health plan offered through the Exchange for the entire taxable year).

### (C) Special rules for individuals related to employees

For purposes of subparagraph (B)(i), if an applicable individual is eligible for minimum essential coverage through an employer by reason of a relationship to an employee, the determination under subparagraph (A) shall be made by reference to[1] required contribution of the employee.

### (D) Indexing

In the case of plan years beginning in any calendar year after 2014, subparagraph (A) shall be applied by substituting for "8 percent" the percentage the Secretary of Health and Human Services determines reflects the excess of the rate of premium growth between the preceding calendar year and 2013 over the rate of income growth for such period.

### (2) Taxpayers with income below filing threshold

Any applicable individual for any month during a calendar year if the individual's household income for the taxable year described in section 1412(b)(1)(B) of the Patient Protection and Affordable Care Act is less than the amount of gross income specified in section 6012(a)(1) with respect to the taxpayer.

### (3) Members of Indian tribes

Any applicable individual for any month during which the individual is a member of an Indian tribe (as defined in section 45A(c)(6)).

### (4) Months during short coverage gaps

#### (A) In general

Any month the last day of which occurred during a period in which the applicable individual was not covered by minimum essential coverage for a continuous period of less than 3 months.

#### (B) Special rules

For purposes of applying this paragraph—

(i) the length of a continuous period shall be determined without regard to the calendar years in which months in such period occur,

(ii) if a continuous period is greater than the period allowed under subparagraph (A), no exception shall be provided under this paragraph for any month in the period, and

(iii) if there is more than 1 continuous period described in subparagraph (A) covering months in a calendar year, the ex-

ception provided by this paragraph shall only apply to months in the first of such periods.

The Secretary shall prescribe rules for the collection of the penalty imposed by this section in cases where continuous periods include months in more than 1 taxable year.

### (5) Hardships

Any applicable individual who for any month is determined by the Secretary of Health and Human Services under section 1311(d)(4)(H) to have suffered a hardship with respect to the capability to obtain coverage under a qualified health plan.

### (f) Minimum essential coverage

For purposes of this section—

### (1) In general

The term "minimum essential coverage" means any of the following:

#### (A) Government sponsored programs

Coverage under—

(i) the Medicare program under part A of title XVIII of the Social Security Act,

(ii) the Medicaid program under title XIX of the Social Security Act,

(iii) the CHIP program under title XXI of the Social Security Act,

(iv) medical coverage under chapter 55 of title 10, United States Code, including coverage under the TRICARE program;[2]

(v) a health care program under chapter 17 or 18 of title 38, United States Code, as determined by the Secretary of Veterans Affairs, in coordination with the Secretary of Health and Human Services and the Secretary,

(vi) a health plan under section 2504(e) of title 22, United States Code (relating to Peace Corps volunteers);[2] or

(vii) the Nonappropriated Fund Health Benefits Program of the Department of Defense, established under section 349 of the National Defense Authorization Act for Fiscal Year 1995 (Public Law 103–337; 10 U.S.C. 1587 note).

#### (B) Employer-sponsored plan

Coverage under an eligible employer-sponsored plan.

#### (C) Plans in the individual market

Coverage under a health plan offered in the individual market within a State.

#### (D) Grandfathered health plan

Coverage under a grandfathered health plan.

#### (E) Other coverage

Such other health benefits coverage, such as a State health benefits risk pool, as the Secretary of Health and Human Services, in coordination with the Secretary, recognizes for purposes of this subsection.

### (2) Eligible employer-sponsored plan

The term "eligible employer-sponsored plan" means, with respect to any employee, a

---

[1] So in original. Probably should be followed by "the".

[2] So in original. The semicolon probably should be a comma.

group health plan or group health insurance coverage offered by an employer to the employee which is—

(A) a governmental plan (within the meaning of section 2791(d)(8) of the Public Health Service Act), or

(B) any other plan or coverage offered in the small or large group market within a State.

Such term shall include a grandfathered health plan described in paragraph (1)(D) offered in a group market.

**(3) Excepted benefits not treated as minimum essential coverage**

The term ''minimum essential coverage'' shall not include health insurance coverage which consists of coverage of excepted benefits—

(A) described in paragraph (1) of subsection (c) of section 2791 of the Public Health Service Act; or

(B) described in paragraph (2), (3), or (4) of such subsection if the benefits are provided under a separate policy, certificate, or contract of insurance.

**(4) Individuals residing outside United States or residents of territories**

Any applicable individual shall be treated as having minimum essential coverage for any month—

(A) if such month occurs during any period described in subparagraph (A) or (B) of section 911(d)(1) which is applicable to the individual, or

(B) if such individual is a bona fide resident of any possession of the United States (as determined under section 937(a)) for such month.

**(5) Insurance-related terms**

Any term used in this section which is also used in title I of the Patient Protection and Affordable Care Act shall have the same meaning as when used in such title.

**(g) Administration and procedure**

**(1) In general**

The penalty provided by this section shall be paid upon notice and demand by the Secretary, and except as provided in paragraph (2), shall be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68.

**(2) Special rules**

Notwithstanding any other provision of law—

**(A) Waiver of criminal penalties**

In the case of any failure by a taxpayer to timely pay any penalty imposed by this section, such taxpayer shall not be subject to any criminal prosecution or penalty with respect to such failure.

**(B) Limitations on liens and levies**

The Secretary shall not—

(i) file notice of lien with respect to any property of a taxpayer by reason of any failure to pay the penalty imposed by this section, or

(ii) levy on any such property with respect to such failure.

(Added and amended Pub. L. 111–148, title I, § 1501(b), title X, § 10106(b)–(d), Mar. 23, 2010, 124 Stat. 244, 909, 910; Pub. L. 111–152, title I, §§ 1002, 1004(a)(1)(C), (2)(B), Mar. 30, 2010, 124 Stat. 1032, 1034; Pub. L. 111–159, § 2(a), Apr. 26, 2010, 124 Stat. 1123; Pub. L. 111–173, § 1(a), May 27, 2010, 124 Stat. 1215.)

REFERENCES IN TEXT

The Patient Protection and Affordable Care Act, referred to in subsecs. (d)(2)(A), (e)(1)(A), (2), and (f)(5), is Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 119. Title I of the Act enacted chapter 157 of Title 42, The Public Health and Welfare, and enacted, amended, and transferred numerous other sections and notes in the Code. Sections 1311(d)(4)(H) and 1412(b)(1)(B) of the Act are classified to sections 18031(d)(4)(H) and 18082(b)(1)(B), respectively, of Title 42. For complete classification of this Act to the Code, see Short Title note set out under section 18001 of Title 42 and Tables.

The Social Security Act, referred to in subsec. (f)(1)(A)(i) to (iii), is act Aug. 14, 1935, ch. 531, 49 Stat. 620. Part A of title XVIII of the Act is classified generally to part A (§ 1395c et seq.) of subchapter XVIII of chapter 7 of Title 42, The Public Health and Welfare. Titles XIX and XXI of the Act are classified generally to subchapters XIX (§ 1396 et seq.) and XXI (§ 1397aa et seq.), respectively, of chapter 7 of Title 42. For complete classification of this Act to the Code, see section 1305 of Title 42 and Tables.

Section 2791 of the Public Health Service Act, referred to in subsec. (f)(2)(A), (3), is classified to section 300gg–91 of Title 42, The Public Health and Welfare.

AMENDMENTS

2010—Subsec. (b)(1). Pub. L. 111–148, § 10106(b)(1), amended par. (1) generally. Prior to amendment, text read as follows: ''If an applicable individual fails to meet the requirement of subsection (a) for 1 or more months during any calendar year beginning after 2013, then, except as provided in subsection (d), there is hereby imposed a penalty with respect to the individual in the amount determined under subsection (c).''

Subsec. (c)(1), (2). Pub. L. 111–148, § 10106(b)(2), amended pars. (1) and (2) generally. Prior to amendment pars. (1) and (2) related to the amount of and dollar limitations on penalty for failure to maintain minimum essential coverage.

Subsec. (c)(2)(B). Pub. L. 111–152, § 1002(a)(1)(A), inserted ''the excess of'' before ''the taxpayer's household income'' and ''for the taxable year over the amount of gross income specified in section 6012(a)(1) with respect to the taxpayer'' before ''for the taxable year'' in introductory provisions.

Subsec. (c)(2)(B)(i). Pub. L. 111–152, § 1002(a)(1)(B), substituted ''1.0'' for ''0.5''.

Subsec. (c)(2)(B)(ii). Pub. L. 111–152, § 1002(a)(1)(C), substituted ''2.0'' for ''1.0''.

Subsec. (c)(2)(B)(iii). Pub. L. 111–152, § 1002(a)(1)(D), substituted ''2.5'' for ''2.0''.

Subsec. (c)(3)(A). Pub. L. 111–152, § 1002(a)(2)(A), substituted ''$695'' for ''$750''.

Subsec. (c)(3)(B). Pub. L. 111–152, § 1002(a)(2)(B), substituted ''$325'' for ''$495''.

Pub. L. 111–148, § 10106(b)(3), substituted ''$495'' for ''$350''.

Subsec. (c)(3)(D). Pub. L. 111–152, § 1002(a)(2)(C), substituted ''$695'' for ''$750'' in introductory provisions and cl. (i).

Subsec. (c)(4)(B)(i), (ii). Pub. L. 111–152, § 1004(a)(1)(C), substituted ''modified adjusted gross'' for ''modified gross''.

Subsec. (c)(4)(C). Pub. L. 111–152, § 1004(a)(2)(B), amended subpar. (C) generally. Prior to amendment, text read as follows: ''The term 'modified gross income' means gross income—

"(i) decreased by the amount of any deduction allowable under paragraph (1), (3), (4), or (10) of section 62(a),

"(ii) increased by the amount of interest received or accrued during the taxable year which is exempt from tax imposed by this chapter, and

"(iii) determined without regard to sections 911, 931, and 933."

Subsec. (c)(4)(D). Pub. L. 111–152, §1002(b)(1), struck out subpar. (D). Text read as follows:

"(i) IN GENERAL.—The term 'poverty line' has the meaning given that term in section 2110(c)(5) of the Social Security Act (42 U.S.C. 1397jj(c)(5)).

"(ii) POVERTY LINE USED.—In the case of any taxable year ending with or within a calendar year, the poverty line used shall be the most recently published poverty line as of the 1st day of such calendar year."

Subsec. (d)(2)(A). Pub. L. 111–148, §10106(c), amended subpar. (A) generally. Prior to amendment, text read as follows: "Such term shall not include any individual for any month if such individual has in effect an exemption under section 1311(d)(4)(H) of the Patient Protection and Affordable Care Act which certifies that such individual is a member of a recognized religious sect or division thereof described in section 1402(g)(1) and an adherent of established tenets or teachings of such sect or division as described in such section."

Subsec. (e)(1)(C). Pub. L. 111–148, §10106(d), amended subpar. (C) generally. Prior to amendment, text read as follows: "For purposes of subparagraph (B)(i), if an applicable individual is eligible for minimum essential coverage through an employer by reason of a relationship to an employee, the determination shall be made by reference to the affordability of the coverage to the employee."

Subsec. (e)(2). Pub. L. 111–152, §1002(b)(2), substituted "below filing threshold" for "under 100 percent of poverty line" in heading and "the amount of gross income specified in section 6012(a)(1) with respect to the taxpayer." for "100 percent of the poverty line for the size of the family involved (determined in the same manner as under subsection (b)(4))." in text.

Subsec. (f)(1)(A)(iv). Pub. L. 111–159, §2(a)(1), added cl. (iv) and struck out former cl. (iv) which read as follows: "the TRICARE for Life program,".

Subsec. (f)(1)(A)(v). Pub. L. 111–173, §1(a), amended cl. (v) generally. Prior to amendment, cl. (v) read as follows: "the veteran's health care program under chapter 17 of title 38, United States Code,".

Subsec. (f)(1)(A)(vii). Pub. L. 111–159, §2(a)(2)–(4), added cl. (vii).

EFFECTIVE DATE OF 2010 AMENDMENT

Pub. L. 111–173, §1(b), May 27, 2010, 124 Stat. 1215, provided that: "The amendment made by subsection (a) [amending this section] shall take effect as if included in section 1501(b) of the Patient Protection and Affordable Care Act [Pub. L. 111–148]."

Pub. L. 111–159, §2(b), Apr. 26, 2010, 124 Stat. 1123, provided that: "The amendments made by this section [amending this section] shall take effect as if included in section 1501(b) of the Patient Protection and Affordable Care Act [Pub. L. 111–148] and shall be executed immediately after the amendments made by such section 1501(b)."

EFFECTIVE DATE

Pub. L. 111–148, title I, §1501(d), Mar. 23, 2010, 124 Stat. 249, provided that: "The amendments made by this section [enacting this section and section 18091 of Title 42, The Public Health and Welfare] shall apply to taxable years ending after December 31, 2013."

## CHAPTER 49—COSMETIC SERVICES

Sec.
5000B.    Imposition of tax on indoor tanning services.

PRIOR PROVISIONS

A prior chapter 49, added Pub. L. 111–148, title IX, §9017(a), Mar. 23, 2010, 124 Stat. 872, which related to

elective cosmetic medical procedures and consisted of section 5000B, was not set out in the Code in view of Pub. L. 111–148, title X, §10907(a), Mar. 23, 2010, 124 Stat. 1020, which provided that the amendments made by section 9017 of Pub. L. 111–148 were deemed null, void, and of no effect.

## § 5000B. Imposition of tax on indoor tanning services

### (a) In general

There is hereby imposed on any indoor tanning service a tax equal to 10 percent of the amount paid for such service (determined without regard to this section), whether paid by insurance or otherwise.

### (b) Indoor tanning service

For purposes of this section—

### (1) In general

The term "indoor tanning service" means a service employing any electronic product designed to incorporate 1 or more ultraviolet lamps and intended for the irradiation of an individual by ultraviolet radiation, with wavelengths in air between 200 and 400 nanometers, to induce skin tanning.

### (2) Exclusion of phototherapy services

Such term does not include any phototherapy service performed by a licensed medical professional.

### (c) Payment of tax

### (1) In general

The tax imposed by this section shall be paid by the individual on whom the service is performed.

### (2) Collection

Every person receiving a payment for services on which a tax is imposed under subsection (a) shall collect the amount of the tax from the individual on whom the service is performed and remit such tax quarterly to the Secretary at such time and in such manner as provided by the Secretary.

### (3) Secondary liability

Where any tax imposed by subsection (a) is not paid at the time payments for indoor tanning services are made, then to the extent that such tax is not collected, such tax shall be paid by the person who performs the service.

(Added Pub. L. 111–148, title X, §10907(b), Mar. 23, 2010, 124 Stat. 1020.)

PRIOR PROVISIONS

A prior section 5000B, added Pub. L. 111–148, title IX, §9017(a), Mar. 23, 2010, 124 Stat. 872, which related to tax on elective cosmetic medical procedures, and section 9017(c) of Pub. L. 111–148, which provided that the amendments made by section 9017 of Pub. L. 111–148 were applicable to procedures performed on or after Jan. 1, 2010, were not set out in the Code in view of Pub. L. 111–148, title X, §10907(a), Mar. 23, 2010, 124 Stat. 1020, which provided that the provisions of, and amendments made by, section 9017 of Pub. L. 111–148 were deemed null, void, and of no effect.

EFFECTIVE DATE

Pub. L. 111–148, title X, §10907(d), Mar. 23, 2010, 124 Stat. 1021, provided that: "The amendments made by